**PEARSON WARSHAW, LLP**
Rachel Soffin (MI Bar No. P89509)
(Admitted *Pro Hac Vice)*
Kelsey Gatlin Davies
(Admitted *Pro Hac Vice)*
Mailing Address:
15165 Ventura Boulevard, Suite 400
Sherman Oaks, California 91403
Telephone: (818) 788-8300
Facsimile: (818) 788-8104
Email: rsoffin@pwfirm.com
kdavies@pwfirm.com

**SMITH KRIVOSHEY, PC**
Yeremey O. Krivoshey (California Bar No. 295032)
Brittany S. Scott (California Bar No. 327132)
28 Geary Str Suite 640 # 1507
San Francisco, CA 94108
Telephone: 415-839-7077
Facsimile: 888-410-0415
E-Mail: yeremey@skclassactions.com
brittany@skclassactions.com

*Attorneys for Plaintiff*

*Additional Counsel Listed in Signature*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SUZETTE ACOSTA, on behalf of herself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>BLACK GOLD COMPOST COMPANY, LLC and BLACK GOLD COMPOST HOLDINGS, INC.,<br><br>Defendants. | Case No. 1:26-cv-03893-KES-EGC<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT**<br><br>JURY TRIAL DEMANDED |

Plaintiff Suzette Acosta ("Plaintiff"), on behalf of herself and all others similarly situated "(Class" or "Classes"),[1] brings this class action against Black Gold Compost Company, LLC and Black Gold Compost Holdings, Inc. ("Defendants"), seeking monetary damages and other remedies.

## NATURE OF THE CASE

1. This is a putative class action lawsuit on behalf of purchasers of Defendants' Black Kow Cow Manure (the "Product"), which Defendants deceptively market as "**organic"** and "**all natural**" for "**vegetable gardens**" when the Product contains synthetic, non-organic harmful perfluoroalkyl and polyfluoroalkyl (PFAS) forever chemicals. Defendants manufacture, market and sell the Product throughout the United States, including the state of California.

2. The Product prominently states in a uniform manner on the bright yellow packaging that the Product is "Organic" and All Natural" and for "Vegetable Gardens" and "Great for Raised Beds" as shown in the images of the Product's packaging below:




[1] Plaintiff brings this class action on behalf of the Nationwide Class and the California Subclass, which are herein referred to collectively as the "Class" or "Classes," and the Members of the Classes are referred to as the "Class Members."

These front label representations are bolstered by statements on the back of the Product packaging that the Product is the "All Natural" and "prefect choice for planting…vegetables" above a large visual representation large of a vegetable garden, with instructions on how to use the Product for growing vegetables, lead reasonable consumers to believe that the Product is safe and appropriate for use in growing food:







3. Reasonable consumers understand Defendants' "organic," "all natural" and "vegetable garden" marketing to mean the Product does not contain any artificial ingredients, including synthetic or chemical ingredients, which are known to be harmful to human health and the environment.

4. Consequently, reasonable consumers, including Plaintiff and Class Members, fairly and reasonably understand that a product marketed with "organic," "all natural" and "vegetable garden" claims would not contain synthetic or chemical ingredients, which are known to be harmful

to human health and the environment, particularly given that they are marketed as the "perfect choice" for "vegetables."

5. Defendants intentionally use the words "organic," "all natural" and "vegetable garden" among others, to drive sales and increase profits, including by targeting health-conscious consumers who reasonably believe that the Product is free from synthetic or chemical ingredients, which are known to be harmful to human health and the environment.

6. Defendants do this because they know consumers actively seek out organic and natural soil amendment products for vegetable gardening with the understanding that the products will not contain any artificial or harmful ingredients, and that if they disclosed the true nature of the Product, it would impact consumer purchasing decisions.

7. Contrary to reasonable consumers' expectations, Defendants' "organic," "all natural" and "vegetable garden" marketing is deceptive and misleading. As detailed herein at Section III, Plaintiff's independent testing has determined that the Product actually contains PFAS—a category of man-made chemicals that are known to be toxic, persistent and bioaccumulative and are associated with numerous health concerns.

8. PFAS do not belong in the Product, and are not necessary to the utility of the Product. *Accordingly, **because the Product contains PFAS,*** a category of synthetic man-made chemicals, the "organic," "all natural" and "vegetable garden" marketing is deceptive and misleading.

9. As such, Defendants have engaged in widespread false and deceptive conduct by designing, marketing, manufacturing, distributing and selling the Product with the uniform "organic," "all natural" and "vegetable garden" marketing claims. Every package of the Product contains these claims, misleading reasonable consumers to believe the Product is "organic," "all natural" and safe for "vegetable garden[s]" when in fact they are not because it contains PFAS that are harmful to consumers and the environment, and do not belong in the Product.

10. Plaintiff and Class Members purchased and paid a premium for the Product. Further, Plaintiff and Class Members relied to their detriment on Defendants' "organic," "all natural" and "vegetable garden" marketing claims when the Product is not in fact "organic," "all natural" nor safe

and suitable for "vegetable garden[s]" because it contains PFAS. Plaintiff and Class Members would not have purchased the Product – or would not have paid as much as they did – had they known the "organic," "all natural" and "vegetable garden" marketing claims were false. Thus, Plaintiff and Class Members suffered monetary damages as result of Defendants' deceptive and false representations.

11. Plaintiff brings this action individually, and on behalf of similarly situated individuals who purchased the false and deceptively labeled Product for violations of California's Consumer Legal Remedies Act, Cal. Bus. & Prof. Code § 1750, *et seq.*; California's False Advertising Law, Cal. Bus. & Prof. Code § 17500, *et seq.*; California's Unfair Competition Act, Cal. Bus. & Prof. Code § 17200, *et seq.*; fraud; and unjust enrichment.

## PARTIES

### Plaintiff

12. At all relevant times, Plaintiff Suzette Acosta, was a resident and citizen of California, who has an intent to remain there, and is therefore a domiciliary of California.

13. On April 29, 2026, Plaintiff purchased a 1 cu. ft bag of Black Kow Cow Manure for her vegetable garden from a Walmart retail store in Atwater, California for $5.97 per bag. Prior to her purchase of the Product, Plaintiff read and reviewed Defendants' marketing and labeling of the Product detailed herein including the material representations in the name of the Product and on the Product's packaging, and marketing claiming the Product is "organic" and "all natural," and safe and suitable for use in growing vegetables.

14. Nowhere in Defendants' marketing and labeling of the Product did Defendants disclose to Plaintiff that the Product contained PFAS. Based on Defendants' marketing and labeling of the Product, including their failure to disclose the presence of PFAS in the Product, Plaintiff believed her Product was "organic," "all natural" and safe and suitable for use in growing vegetables, and did not reasonably expect that the Product contained PFAS. The "organic" and "all natural" marketing claims, and the claims that the Product was suitable for use in growing vegetables, were material to Plaintiff's purchasing decision.

15. In reliance on Defendants' organic" and "all natural" marketing claims as well as Defendants' claims that the Product was suitable for use in growing vegetables, Plaintiff purchased her Product and paid a premium price for the Product. Accordingly, the "organic" and "all natural" marketing claims, and the claims that the Product is suitable for use in growing vegetables, were part of the basis of her bargain with Defendants.

16. Had Plaintiff known of the Product's true nature, and of Defendants' deceptive, unfair and unlawful conduct, she would not have purchased the Product or would have paid less for it.

17. Because Defendants unlawfully concealed material facts from Plaintiff before her purchase, Plaintiff did not suspect (and had no reason to suspect) that the Product would not conform to the "organic" and "all natural" marketing claims, as well as the claims that the Product was suitable for use in growing vegetables, as represented.

18. Plaintiff remains interested in purchasing the Product if it was actually "organic," "all natural" and safe and suitable for use in growing vegetables as marketed, and did not contain PFAS, and if she could have confidence regarding the truth of the Product's marketing and advertising. However, because of the false, deceptive and misleading "organic" and "all natural" marketing claims, as well as the marketing claims regarding the Product's suitability for use in growing vegetables, Plaintiff is unable to rely on the Product advertising and packaging when deciding in the future whether to purchase the Product. Therefore, she will be harmed in the future as a result of Defendants' deceptive, unfair and unlawful conduct described herein as she is unable to reasonably rely on Defendants' marketing and labeling.

19. Plaintiff put Defendants on direct notice of her claims by certified letter dated May 13, 2026.

**Defendants**

20. Defendant Black Gold Compost Company, LLC is a Florida limited liability company with its principal place of business at 130 S. Main Street, Winter Garden, Florida 34787. Defendant Black Gold Compost Company, LLC markets, sells and distributes the Product throughout the United States, including in the State of California.

21. Defendant Black Gold Compost Holdings, Inc. is a Florida corporation company with its principal place of business at 1750 Buena Vista Drive, Eustis, Florida 32726. Defendant Black Gold Compost Holdings, Inc. markets, sells and distributes the Product throughout the United States, including in the State of California.

22. Based on representations of counsel for Defendant Black Gold Compost Company, LLC, Defendants are responsible for the design and formulation of the Product.

23. Defendants are also responsible for the labeling, advertising and marketing of the Product. With its bright yellow packaging, Defendants have carefully crafted the branding scheme for Black Kow to stand out at garden centers nationwide, with Defendants representing to consumers that they can go to their "local retailer today!"[2] and "pick up the bright yellow bag and get going."[3] See the image below from Defendants' YouTube video posted on their website as well:[4]




24. The back of each bright yellow Black Kow package sold in the United States, including California, includes the following image, inviting consumers to visit the Black Kow website "for more information" about the Product:




[2] https://www.blackkow.com/home_(including https://www.youtube.com/watch?v=mWwyOWHcmP4&t=58s (last accessed Aug. 5, 2026).
[3] https://www.blackkow.com/home_(including https://www.youtube.com/watch?v=qq_Y3keaIys&t=4s) (last accessed Aug. 5, 2026)
[4] https://www.blackkow.com/home_(including https://www.youtube.com/watch?v=mWwyOWHcmP4&t=58s (last accessed Aug. 5, 2026).

25. California consumers visiting the Black Kow website can find information about "How to Use" the Product,[5] "Sustainable Gardening With Black Kow,"[6] "Black "Kow How" To Videos"[7] and contact information for "more information about our Black Kow® products."[8]

26. Further, the back of each bright yellow Black Kow package sold in the United States, including California, contains the following image, inviting California consumers to visit the Black Kow website at www.blackkow.com/kowstuff to order a Cap and T-Shirt displaying the Black Kow logo:




27. In addition, Defendants have touted their creation of the content on the Product packaging, which is materially identical to packaging on the Product sold throughout the United States, including in California.

---

[5] *See e.g.* https://blackkow.com/vegetable_gardens (last accessed Aug. 6, 2026).
[6] https://blackkow.com/sustainable_gardening (last accessed Aug. 6. 2026).
[7] https://blackkow.com/black_kow__how_to__videos (last accessed Aug. 6, 2026).
[8] https://blackkow.com/contact (last accessed Aug. 6, 2026).



[9]

[9] https://www.facebook.com/reel/331451869558635 (last accessed Aug. 5, 2026).



[10]

28. Thus, Defendants designed the Product for the market in California, advertised the Product in California and established channels for providing advice and information regarding the Product to consumers in California.

---

[10] https://www.facebook.com/BlackKowCowManure/posts/have-you-ever-wondered-how-black-kow-comes-to-you-in-those-pretty-yellow-bags-it/10155541237371790/ (last accessed Aug. 8, 2026).

29. Defendants utilize their successful Black Kow brand marketing campaign to sell their Product across the United States, including California through Defendants' retailers such as Lowes and Home Depot and through Defendants' distributors such as Gro-Well Brands, Inc. Regardless of which distributor or retailer is used by Defendants to sell their Product, Defendants' brand marketing is identical. Indeed, Defendants ensure that their distributors and retailers acquire the finished Product and deliver and/or sell the finished Product to the end consumer in their iconic big yellow bag with their advertising described herein on each bag. The uniformity of the Product's marketing including the Black Kow branding is vitally important to Defendants, as the designers, manufactures and marketers of a nationwide brand.

## JURISDICTION AND VENUE

30. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A) because this case is a class action where the aggregate claims of all Members of the proposed Class are in excess of $5,000,000.00, exclusive of interest and costs, and at least one Member of the proposed Class is citizen of a state different from Defendants.

31. This Court has specific jurisdiction over Defendants because they conduct substantial business within California, including the sale, marketing and advertising of the Product. Furthermore, a substantial portion of the events giving rise to Plaintiff's claims occurred in this State, including Plaintiff's purchase.

32. Venue is proper pursuant to 28 U.S.C. § 1391(b) because Defendants do substantial business in this District and a substantial part of the events giving rise to Plaintiff's claims occurred in this District.

## FACTUAL ALLEGATIONS

### I. Defendants' "Organic," "All Natural" and "Vegetable Garden" Marketing

33. The lawn and garden consumables market is estimated to be valued at $94 billion, and is expected to climb to $99.6 billion by 2030.

34. As consumers show a growing interest in personal health and wellness, they have turned toward organic and all natural home gardening in search of healthy and environmentally

friendly food options. As a result, consumers are spending more on organic and natural gardening, particularly for growing food.

35. In an already crowded market, there is enormous incentive for companies such as Defendants to cultivate a wellness-minded corporate image and market their products as organic and natural, leading consumers to believe the Product is safe and suitable for use, particularly for growing vegetables for home consumption.

36. Defendants' Black Kow brand is a leading brand in the organic and all natural gardening market. Defendants have worked very hard since Black Kow was founded in 1969 to convince consumers that their Black Kow branded products are a cut above the rest when it comes to their organic and all natural status. Consequently, reasonable consumers recognize the Black Kow brand as a reliable source of organic and all natural gardening products.

37. Defendants' brand marketing in conjunction with the Product's conspicuous "organic" and "all natural" representations, as well as its suitability for use in growing vegetables for human consumption, further contribute to the reasonable consumer perception and belief that the Product contains only natural ingredients and is free of man-made chemicals.

38. Defendants falsely and misleadingly label their Product as "organic" and "all natural," and suitable for use in "Vegetable Gardens" and "Great for Raised Beds" as depicted below:












39. Further, Defendants' marketing of the Product as suitable for "Vegetable Gardens" and "Great for Raised Beds," on the front of the product packaging, are bolstered by statements on the back of the Product packaging that the Product is the "All Natural" "prefect choice for planting…vegetables" above a large picture of a vegetable garden, with instructions on how to use the Product for growing vegetables, lead reasonable consumers to believe that the Product is safe and appropriate for use in growing food:







40. This marketing is made directly to consumers and uniformly displayed on the packaging and marketing of the Product.

41. Defendants corroborate their "organic," "all natural" and "vegetable garden" marketing on their website, emphasizing that the Product is "[t]he all-natural organic way to improve native soils:"

Black Kow Mature Manure




The all-natural organic way to improve native soils is to start with Black Kow® composted cow manure - The "Mature Manure." Black Kow® has 10 times more nutrients than typical garden soil, and 4 to 6 times more cow manure than other brands. By mixing Black Kow® cow manure with your native soil before planting, you do 3 important things:

- Provide moisture holding capacity to sandy soils. Black Kow® cow manure holds water and nutrients in the soil around the roots. The roots can use the water and nutrients when needed instead of letting the nutrients leach through the soil.
- Provide aeration and moisture holding capacity to hard, clay-type soils. Black Kow® cow manure helps break up those soils so that water and nutrients are available to the plant when needed.
- Give your plant's roots the optimum environment in which to get started. Black Kow® cow manure contains millions of beneficial bacteria. These bacteria convert nitrogen and other nutrients into an easily available form for the plant. It is organic and contains nutrients that are released slowly without burning tender roots. These nutrients and moisture are held in the soil around roots until the plant needs them.

42. Defendants go as far to boldly claim on the "How It's Made" webpage that the Product is "made from the finest raw materials available … manure from dairy farms…. We never add any chemicals to our product:

Our "Production" Team



Black Kow® "The Mature Manure" is made from the finest raw materials available...manure from dairy farms. Black Kow®, has 4 to 6 times more nutrients than typical garden soils. It all starts at the dairy farm where we "employ" over 20,000 cows a year to get enough raw material for Black Kow® compost. We never add any chemicals to our product.

43. Similarly, Defendants' website emphasizes that the Product is suitable for "sustainable gardening practices" and will "cause no harm to the earth and its inhabitants":

**Sustainable Gardening With Black Kow**



Sustainable gardening practices are those that cause no harm to the earth and its inhabitants while attempting to actually enhance it. Sustainable gardening allows your garden to live and thrive in a healthy setting as these techniques benefit your plants and reduce the chance of negative impact on the environment. Whether you are a beginner or a seasoned pro, there are several practices that can help you maintain a sustainable garden this season.

Sustainability is using water and all other natural resources in a planned way. Growing your own fruits and vegetables can help you be healthier. Growing your own fruits and vegetables will save your money at the grocery store. Gardening increases physical activity. It also increases food security. Food security is having access to and being able to afford nutritious, safe food—and enough of it. One of the benefits of enjoying garden vegetables is a reduced monthly food bill. Consuming more fresh fruits and vegetables is one of the most important things you can do to stay healthy.

Get great results in your garden when you use Black Kow.

- Feeds naturally for up to 3 months.
- The Mature Manure- Black Kow is aerobically composted and then aged for several months before going into the bag.
- Black Kow is stable, odor free and maturewhen it goes in your garden or lawn.
- 10 times more nutrients than garden soil.
- Increased nutrient content.
- Moisture efficient, you'll use less water

44. Defendants disseminate their "organic," "all natural" and "vegetable garden" marketing directly to consumers nationwide before and at the point of purchase, throughout their marketing channels, including on their website and the websites of their authorized retailers.

45. Defendants are well aware that this marketing is material to an ordinary and reasonable consumer in deciding what gardening products to purchase.

46. This marketing on the Product's packaging, labeling and advertising is conspicuous and designed to grab the consumer's attention.

47. In this way, Defendants carefully and intentionally designed their labels, advertising, packaging of the Product, including the placement of the "organic" and "all natural" marketing, as well as the marketing intended to convince consumers that the Product is safe and suitable for growing vegetables, so that reasonable consumers viewing the Product will read the claims, understand the claims and rely on the claims to make purchasing decisions.

48. Defendants have engaged in this marketing in an effort to convince reasonable consumers to believe that the Product is superior to other products that are not "organic," "all natural" or safe and suitable for "vegetable garden[s]."

49. Consumers lack the expertise to ascertain the true ingredients in the Product prior to purchase. Accordingly, reasonable consumers must, and do, rely on Defendants to accurately and honestly advertise their Product as "organic" or "all natural," and as safe and suitable for growing vegetables, and not contradict those representations by having (and failing to disclose) artificial man-made chemicals in their Product that are known to pose a risk to human health and the environment. Such misrepresentations are material to reasonable consumers' purchasing decisions.

50. Defendants' aforementioned representations are false and misleading because products containing toxic, man-made ingredients like PFAS are not "organic" or "all natural" by definition, and are not safe and suitable for use in growing vegetables.

51. Defendants bore a clear duty to disclose the detectable and elevated levels of PFAS in the Product so that consumers could make informed purchasing decisions. Instead, Defendants concealed and failed to disclose the presence of PFAS to consumers. Had Plaintiff and Class Members been aware of this material information, they would not have purchased the Product or would have paid less for them.

52. Plaintiff and Class Members purchased and paid a premium for the Product in reliance on the "organic," "all natural," and "vegetable garden" marketing, reasonably believing the Product was in fact "organic," "all natural," and suitable for use in growing vegetables, and therefore would not contain chemicals potentially harmful to their health or the environment.

53. Plaintiff's and Class Members' reasonable belief that the Product was "organic," "all natural," and suitable for use in growing vegetables, was a significant and material factor in their decisions to purchase and pay a premium for the Product.

54. At the time of purchase, Plaintiff and Class Members did not know, and had no reason to know, that the Product was not "organic" and "all natural," and was not suitable for use in growing vegetables, because of how the Product is deceptively labeled and advertised to create the impression

that the Product does not contain chemicals that are harmful to health or the environment. Nothing on the Product's labeling indicates the Product would not be "organic" or "all natural," or unsuitable for use in growing vegetables, as promised.

55. At the time of purchase, Defendants knew or should have known that the Product was not "organic" and "all natural" and was not suitable for use in growing vegetables, and thus incapable of complying with the Defendants' marketing.

56. Defendants knew that Plaintiff and Class Members would rely on the Product marketing and would, therefore, reasonably believe the Product is "organic" and "all natural" and suitable for use in growing vegetables.

57. Because of the "organic," "all natural" and "vegetable garden" marketing, Plaintiff and Class Members were induced to make purchases they otherwise would not have, but for the belief that the Product was "organic" and "all natural" and suitable for growing vegetables.

58. Plaintiff and Class Members would not have purchased the Product had they known that the Product is not "organic" and "all natural" or unsuitable for growing vegetables.

59. Plaintiff and Class Members paid a price premium for the Product because of the Defendants' "organic," "all natural" and "vegetable garden" marketing.

60. Therefore, Plaintiff and Class Members suffered an injury in fact and lost money as a result of Defendants' false and misleading "organic," "all natural" and "vegetable garden" marketing, and Defendants' failure to disclose PFAS in the Product.

**I. PFAS Are Not Organic or Natural.**

61. When a product contains PFAS, it is by definition not organic or all natural. Reasonable consumers including Plaintiff and Class Members understand this and thus, do not expect the Product to contain PFAS, particularly when they are told by Defendants that the Product is perfect for use in growing vegetables for human consumption.

62. Detailed below, contrary to Defendants' marketing claims that the Product is "organic" and "all natural," and that it is suitable for use in growing vegetables, Plaintiff's independent testing has confirmed that the Product actually contains PFAS.

63. Defendants have the ability to eliminate PFAS in their Product, but have not taken any measures to do so as indicated by recent testing conducted by Plaintiff.

64. PFAS are a category of highly persistent chemicals.[11] **PFAS are not organic or naturally occurring**.[12] They are man-made and have been used in industrial and commercial products since the 1940s.[13] Therefore, PFAS are **indisputably synthetic chemicals.**

65. According to the United States Department of Agriculture ("USDA"), produce may only be labeled as "organic" if it is certified to have been grown without synthetic fertilizers.[14] When consumers, including Plaintiff and Class Members, read and reviewed Defendants' "organic" and "all natural" marketing on their Product advertised as safe and suitable for vegetable gardening, they did not reasonably expect the Product to contain PFAS. Indeed, diet is a major route of PFAS exposure for humans, and reasonable consumers purchasing a product represented as "organic," "all natural" and safe and suitable for "vegetable garden[s]" would not expect it to contain harmful man-made chemicals, such as PFAS.[15]

66. Under the relevant USDA regulations, "organic matter" means the "remains, residues, or waste products of any organism"[16] and "organic fraud" means the "deceptive representation, sale, or labeling of nonorganic agricultural products or ingredients as 100 percent organic, organic, or made with organic [ingredients]."[17]

67. The USDA's National List of Allowed and Prohibited Substances[18] maintained for organic production permits nonsynthetic materials, but clearly prohibits the use of synthetic materials

---

[11] https://www.epa.gov/pfas/pfas-explained (last visited May 18, 2026).
[12] https://www.atsdr.cdc.gov/pfas/resources/pfas-faqs.html (last visited May 18, 2026).
[13] https://www.atsdr.cdc.gov/pfas/health-effects/index.html (last visited May 18, 2026).
[14] https://www.usda.gov/about-usda/news/blog/organic-101-what-usda-organic-label-means (last visited May 18, 2026).
[15] https://ehp.niehs.nih.gov/doi/full/10.1289/EHP4092 (last visited May 18, 2026).
[16] 7 C.F.R. § 205.2.
[17] *Id.* (citation modified).
[18] 7 C.F.R. §§ 205.600–205.602.

unless they are specifically identified.[19] Moreover, the USDA's National List does not identify any "allowed" PFAS.

68. Therefore, PFAS do not fall within any definition of organic or all natural, and no reasonable consumer would expect to find any harmful chemicals—let alone man-made forever chemicals like PFAS—in a product labeled organic and all natural.

**II. PFAS Are Dangerous to Humans and the Environment.**

69. In addition to not being organic or all natural, PFAS are **dangerous to humans and the environment.** Indeed, two specific types of PFAS, which were detected in the Product as detailed below—perfluorooctanoic acid (PFOA) and perfluorooctane sulfonate (PFOS)—have been confirmed as dangerous substances by the United States Environmental Protection Agency.

70. While there are thousands of varieties of PFAS chemicals in existence, all PFAS contain carbon-fluorine bonds—one of the strongest in nature—which makes them highly persistent in the environment and in human bodies.[20] For this reason, PFAS chemicals are often called "forever chemicals."

71. In the words of Dr. Graham Peaslee, a nuclear scientist, professor and researcher at the University of Notre Dame, "I've never met the good PFAS, and there are no such things. They are all long-lived, they all bioaccumulate, a good number of them are shown to be toxic and the rest we just haven't measured yet."[21]

72. Crucially, PFAS can be harmful even at extremely low levels of exposure.[22] Indeed, because of their persistence and bioaccumulative nature, all PFAS are harmful. The United States Environmental Protection Agency ("EPA") recently confirmed that the levels at which negative health effects could occur are much lower than previously understood– including near zero in some

[19] *Id.* §§ 205.601, 206.602; *see also* USDA Agriculture Marketing Service, *The National List of Allowed and Prohibited Substances*, https://www.ams.usda.gov/rules-regulations/organic/national-list (last visited May 18, 2026).
[20] https://ntp.niehs.nih.gov/whatwestudy/topics/pfas/index.html (last accessed May 18, 2026).
[21] https://www.pbs.org/newshour/science/pfas-are-everywhere-what-can-we-do-to-change-that (last accessed May 18, 2026).
[22] https://www.washingtonpost.com/climate-environment/2022/06/15/epa-pfas-forever-chemicals/ (last accessed May 18, 2026).

cases.[23] In other words, there is no "safe" level of exposure with regard to these chemicals, and even "trace" levels of PFAS can pose a risk to humans.

73. Notably, PFAS persist and bioaccumulate in the food chain when released into the environment and build up in the body when humans consume PFAS-contaminated food or water or are otherwise exposed to PFAS.[24]

74. Humans can be exposed to PFAS in a variety of ways, including through ingestion, inhalation, and skin absorption.[25]

75. PFAS chemicals have been associated with numerous negative health effects for humans and the environment including, but not limited to, decreased male and female fertility, negative developmental effects or delays in children, increased risk of cancers, liver damage and thyroid disease, adverse impacts on the immune system, interference with hormones and increased cholesterol levels.[26]

76. A large number of studies have examined the potential harmful health effects of exposure to PFAS. In a 2019 study (revised in 2022), the U.S. Department of Health and Human Services' National Toxicology Program found that PFAS have adverse effects on human organ systems, including impacting the liver and thyroid hormone.[27]

---

[23] *Id.*

[24] Sibel Barisci & Rominder Suri, *Occurrence and Removal of Poly/Perfluoroalkyl Substances (PFAS) in Municipal and Industrial Wastewater Treatment Plants*, 84(12) Water Science & Tech. 3442, 3443 (2021), https://pdfs.semanticscholar.org/3b10/37f0c12ad3757c8ffd0922cff95ab36ecb46.pdf (last accessed May 18, 2026).

[25] https://ntp.niehs.nih.gov/whatwestudy/topics/pfas/index.html (last accessed May 18, 2026).

[26] *See* https://www.epa.gov/pfas/our-current-understanding-human-health-and-environmental-risks-pfas (last accessed February 20, 2023); https://www.atsdr.cdc.gov/pfas/health-effects/index.html (last accessed May 18, 2026); https://www.nytimes.com/2020/09/23/parenting/pregnancy/pfas-toxins-chemicals.html (last accessed May 18, 2026).

[27] https://ntp.niehs.nih.gov/whatwestudy/topics/pfas/index.html (last accessed May 18, 2026).

77. A figure from the European Environmental Agency ("EEA") shows the "[e]ffects of PFAS on human health:"[28]




78. The EEA has further explained that "[p]eople most at risk of adverse health impacts are those exposed to high levels of PFAS, and vulnerable population groups such as children and the elderly."[29]

79. The Center for Disease Control's Agency for Toxic Substances and Disease Registry has recognized that exposure to high levels of PFAS may also impact the immune system and reduce antibody responses to vaccines.[30]

80. Costs to society arising from PFAS exposure are high, with the annual health-related costs estimated to be EUR 52-84 billion across Europe in a recent study (Nordic Council of Ministers,

[28] https://www.eea.europa.eu/publications/emerging-chemical-risks-in-europe (last accessed May 18, 2026).
[29] *Id.*
[30] https://www.atsdr.cdc.gov/pfas/health-effects/index.html (last accessed May 18, 2026).

2019).[31] The study notes that these costs are likely underestimated, as only a limited range of health effects (high cholesterol, decreased immune system and cancer) linked to exposure to a few specific PFAS were included in the estimates.[32]

81. There is no treatment to remove PFAS from the body. Therefore, experts agree the most effective strategy to decrease risk is to avoid and/or limit exposure to products known to contain PFAS.

82. "The Madrid Statement," a scientific consensus regarding the persistence and potential for harm of PFAS substances issued by the Green Science Policy Institute and signed by more than 250 scientists from 38 countries, recommended actions in order to mitigate future harm, including: (1) discontinuing use of PFAS where not essential or safer alternatives exist; (2) labeling products containing PFAS; and (3) encouraging retailers and individual consumers to avoid products containing or manufactured using PFAS whenever possible.[33]

83. Further, soil amendments containing PFAS have been linked to contamination of end products grown or raised with PFA-contaminated soil amendment products. For example, fertilizer containing PFAS has been known to harm the environment, kill livestock, and has forced farmers to shut down because their produce and livestock was found unsafe to sell due to PFAS contamination.[34] PFAS in contaminated soil amendments can be absorbed by crops, including the vegetables that consumers are growing with use of the Product, which are then consumed by humans. *Id.*

**III. Testing for PFAS.**

84. As part of her thorough pre-suit investigation, Plaintiff, by and through her counsel, commissioned independent third-party targeted testing of the Product at issue, which unequivocally confirms the existence of PFAS in the Product that Plaintiff and the Class purchased.

---

[31] https://www.eea.europa.eu/publications/emerging-chemical-risks-in-europe (last accessed May 18, 2026).
[32] *Id.*
[33] https://greensciencepolicy.org/our-work/science-policy/madrid-statement/ (last accessed May 18, 2026).
[34] https://pirg.org/articles/are-there-toxic-chemicals-in-your-gardens-fertilizer/ (last accessed Aug. 6, 2026).

85. Specifically, targeted testing of Black Kow's Product was arranged with the assistance of a reputable independent product testing laboratory with experience testing for PFAS in similar products, which was conducted on January 30, 2026.

86. The laboratory tested the Product for PFAS using the EPA Method 1633A, which is a laboratory-validated method to test for 40 PFAS compounds across nine compound classes for environmental samples, including soil.[35] Indeed, "EPA recommends the use of this method, and it is currently the only PFAS method that has been validated in multiple laboratories for aqueous matrices that include wastewater, surface water, groundwater, and landfill leachate, as well as for soil, sediment, biosolids, and fish and shellfish tissue."

87. Of note, using Method 1633A, the EPA established Regional Screening Levels (RSLs) for chemicals, including PFAS, under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA).[36] RSLs establish chemical specific concentrations for contaminants, including in soil, that, if exceed, may warrant further action or study because there is a concern that the levels of PFAS are high enough to pose a threat to human health.

88. To put this in context, **testing performed on Defendants' Product, the same Product purchased by Plaintiff, detected material levels of PFAS in the Product**. This testing revealed two types of PFAS in the Product including PFOS at levels up to 4.52 ng/g and PFOA at levels up to 2.75 ng/g. The level of PFASs detected in the Product were **more than 100 times higher than the applicable RSLs**.

89. Thus, Defendants' Product exposes hundreds of thousands of unsuspecting consumers to toxic synthetic chemicals in direct contradiction to their uniform "organic," "all natural," and "vegetable garden" marketing claims.

---

[35] U.S. EPA, *Method 1633, Revision A: Analysis of Per- and Polyfluoroalkyl Substances (PFAS) in Aqueous, Solid, Biosolids, and Tissue Samples by LC-MS/MS* at 1 (Dec. 2024), https://www.epa.gov/system/files/documents/2024-12/method-1633a-december-5-2024-508-compliant.pdf.

[36] *Id.*

**IV. No Adequate Remedy at Law.**

90. Plaintiff and members of the California Subclass are entitled to equitable relief as no adequate remedy at law exists.

91. **Broader Statues of Limitations.** The statutes of limitations for the causes of action pled herein vary. The limitations period is four years for claims brought under the UCL, which is one year longer than the statutes of limitations under the FAL and CLRA. Thus, without application of tolling, California Subclass Members who purchased the Product more than 3 years prior to the filing of the complaint will be barred from recovery if equitable relief were not permitted under the UCL. Similarly, California Subclass Members who purchased the Product prior to the furthest reach-back under the statute of limitations for breach of warranty or fraud will be barred from recovery if equitable relief were not permitted for restitution/unjust enrichment.

92. **More Prompt, Certain and Efficient.** Legal remedies are inadequate because they are not equally prompt and certain and in other ways efficient as equitable relief. Legal claims for damages are not equally certain as restitution because claims under the UCL and other equitable claims entail few elements.

93. **Broader Scope of Conduct.** In addition, the scope of actionable misconduct under the unfair prong of the UCL is broader than the other causes of action asserted herein. It includes, for example, Defendants' overall unfair marketing scheme to promote and brand the Product with "organic," "all natural" and "vegetable garden" marketing, including the Product's label and packaging, over a long period of time, in order to gain an unfair advantage over competitor products and to take advantage of consumers' desire for products that comport with Defendants' "organic," "all natural" and "vegetable garden" marketing. The UCL also creates a cause of action for violations of law (such as statutory or regulatory requirements and court orders related to similar representations and omissions made on the type of products at issue). Thus, Plaintiff and the California Subclass may be entitled to restitution under the UCL, while not entitled to damages under other causes of action asserted herein (e.g., the FAL requires actual or constructive knowledge of the falsity; the CLRA is limited to certain types of Plaintiff (an individual who seeks or acquires, by purchase or

lease, any goods or services for personal, family, or household purposes) and other statutorily enumerated conduct; common law fraud claims require a showing of actual deception or reliance).

94. **Injunctive Relief to Cease Misconduct and Dispel Misperception.** Injunctive relief is appropriate on behalf of Plaintiff and the California Subclass because Defendants continue to misrepresent the Product with their "organic," "all natural" and "vegetable garden" marketing. Injunctive relief is necessary to prevent Defendants from continuing to engage in the unfair, fraudulent and/or unlawful conduct described herein and to prevent future harm - none of which can be achieved through available legal remedies (such as monetary damages to compensate past harm). Further, injunctive relief, in the form of removing Defendants' "organic," "all natural" and "vegetable garden" marketing is necessary to dispel the public misperception about the Product that has resulted from years of Defendants' unfair, fraudulent and unlawful marketing efforts. An injunction requiring removal of the claim will prevent the ongoing deception and repeat purchases based thereon. It is also not available through a legal remedy (such as monetary damages). In addition, injunctive relief is necessary because discovery and Plaintiff's investigation have not yet completed. Moreover, because the court has not yet certified any class, the following remains unknown: the scope of the Class, the identities of its Members, their respective purchasing practices, prices of past/future Product sales and quantities of past/future Product sales.

95. **Public Injunction.** Further, because a "public injunction" is available under the UCL, damages will not adequately "benefit the general public" in a manner equivalent to an injunction.

96. **Procedural Posture - Incomplete Discovery & Pre-Certification.** Lastly, this is an initial pleading in this action, and discovery has not yet commenced and/or is at its initial stages. No class has been certified yet. No expert discovery has commenced and/or completed. The completion of fact/non-expert and expert discovery, as well as the certification of this case as a class action, are necessary to finalize and determine the adequacy and availability of all remedies, including legal and equitable, for Plaintiff's individual claims and any certified class or subclass. Plaintiff therefore reserves the right to amend this complaint and/or assert additional facts that demonstrate this Court's jurisdiction to order equitable remedies where no adequate legal remedies are available for either

Plaintiff and/or any certified class or subclass. Such proof, to the extent necessary, will be presented prior to the trial of any equitable claims for relief and/or the entry of an order granting equitable relief.

## TOLLING AND ESTOPPEL OF STATUTE OF LIMITATIONS

**Discovery Rule**

97. Plaintiff and Class Members did not discover and could not have discovered through reasonable diligence that the Product was not "organic," "all natural" and safe and suitable for use in "vegetable garden[s]" as represented and warranted within the time-period of any applicable statutes of limitation. There is no evidence that Plaintiff was aware that the Product was not "organic," "all natural" and safe and suitable for use in "vegetable garden[s]" as represented and warranted as promised by Defendants.

98. Defendants misrepresented the Product as "organic," "all natural" and safe and suitable for use in "vegetable garden[s]" through their labeling and marketing channels. Defendants concealed that the Product was not "organic," "all natural" and safe and suitable for use in "vegetable garden[s]" as represented and warranted. Plaintiff and other Class Members could not have reasonably discovered and could not have known of facts that would have caused a reasonable person to suspect that Defendants knowingly failed to disclose material information within their knowledge about the Product.

99. As such, no potentially relevant statute of limitations should be applied.

**Fraudulent Concealment**

100. Any applicable statutes of limitation have been tolled by Defendants' knowing, active and ongoing concealment and denial of the facts throughout the time period relevant to this action as alleged herein.

101. Defendants were, and are, under a continuous duty to disclose to Plaintiff and the Class the true character, quality and nature of the Product, particularly with respect to whether they are "organic," "all natural" and safe and suitable for use in "vegetable garden[s]" as represented and warranted.

102. At all relevant times, Defendants knowingly, affirmatively and actively misrepresented and concealed the true character, quality and nature of the Product and sold the Product into the stream of commerce with Defendants' "organic," "all natural" and "vegetable garden" marketing. As a result, neither Plaintiff nor the other Class Members could have discovered the true character, quality and nature of the Product, even upon reasonable exercise of due diligence.

103. Throughout the Class Period, at all relevant times, Defendants have known that the Product, which they designed, manufactured, selected materials for and sold, was not "organic" and "all natural" or safe and suitable for vegetable gardening as represented and warranted.

104. Defendants' actual knowledge of the serious safety concerns surrounding the Product is evidenced by, among other things, Defendants' formulation, manufacture and sale of the Product and testing of the Product for internal and certification purposes. Despite this knowledge, Defendants failed to disclose and instead, concealed material information from Plaintiff and other Class Members, including that the Product is not "organic," "all natural" and safe and suitable for use in "vegetable garden[s]" despite Defendants' marketing as detailed herein, even though, at any point in time, Defendants could have disclosed this material information through a recall, individual correspondence, media release, or by other means.

105. Instead, Defendants continued to market the Product as "organic," "all natural" and safe and suitable for use in "vegetable garden[s]" with Defendants' marketing detailed herein. The purpose of this concealment was to continue to profit from the sale of their popular Product and to prevent Plaintiff and other Class Members from seeking redress.

106. Plaintiff and the other Class Members justifiably relied on Defendants to disclose the true nature of the Product they purchased and/or owned because its true nature regarding whether it was "organic," "all natural" and safe and suitable for use in "vegetable garden[s]" as represented and warranted was not discoverable by Plaintiff and the other Class Members through reasonable efforts.

107. Any applicable statute of limitations has been tolled by Defendants' knowledge, active concealment and denial of the facts alleged herein, which is ongoing.

**Estoppel**

108. Defendants were, and are, under a continuing duty to disclose to Plaintiff and the Class the true character, quality and nature of the Product, namely whether they are “organic,” “all natural” and safe and suitable for use in “vegetable garden[s]” as represented.

109. Defendants knowingly, affirmatively and actively concealed the true character, quality and nature of the Product. Plaintiff and the Class reasonably relied on Defendants’ “organic,” “all natural” and “vegetable garden” marketing.

110. For these reasons, Defendants are estopped from relying on any statute of limitations in defense of this action.

111. Additionally, Defendants are estopped from raising any defense of laches due to their own conduct as alleged herein.

**FED. R. CIV. P. 9(b) ALLEGATIONS**

***(Affirmative and By Omission)***

112. Although Defendants are in the best position to know what content they placed in their marketing materials during the relevant timeframe, and the knowledge that they had regarding the true nature of the Product and specifically, whether the Product was “organic,” “all natural,” and safe and suitable for use in “vegetable garden[s]” to the extent necessary, Plaintiff satisfies the requirements of Rule 9(b) by alleging the following facts with particularity:

113. **Who**: Defendants engaged in the deceptive and fraudulent conduct through their “organic,” “all natural” and “vegetable garden” marketing on the Product’s packaging and labeling, and marketing materials, in written form.

114. **What**: Defendants’ conduct here through their “organic,” “all natural” and "vegetable garden" marketing, was and continues to be deceptive and fraudulent. Defendants’ conduct is deceptive because they uniformly misrepresented the Product as “organic,” “all natural” and safe and suitable for “vegetable garden[s]” while omitting and concealing that the Product is not “organic,” “all natural” nor safe and suitable for “vegetable garden[s]” for the reasons stated in Section III, which is in direct conflict with Defendants’ “organic,” “all natural” and “vegetable garden”

marketing and the expectations of reasonable consumers including Plaintiff and Class Members. Defendants' conduct deceived Plaintiff and the Class into believing that the Product was "organic," "all natural" and safe and suitable for "vegetable garden[s]." Defendants knew, or should have known, that this information is material to reasonable consumers, including Plaintiff and the Class, in making their purchasing decisions. However, Defendants omitted and concealed necessary information that the Product is not "organic," "all natural" nor safe and suitable for "vegetable garden[s]" because it contains PFAS. No reasonable consumer would expect that the Product, marketed as "organic," "all natural" and safe and suitable for "vegetable garden[s]" would contain harmful chemicals like PFAS.

115. **When**: Defendants designed their "organic," "all natural" and "vegetable garden" marketing on the Product, detailed herein, during the class period and prior to and at the point of sale, leaving Plaintiff and the Class unaware of the true nature of the Product prior to purchasing and paying a premium for them.

116. **Where**: Defendants' "organic," "all natural" and "vegetable garden" marketing was made on the Product's packaging and labeling, and marketing materials, through employees, and through authorized retailers as well as in the name of the Product.

117. **How**: Defendants disseminated their "organic," "all natural" and "vegetable garden" marketing in written and electronic form, or conventional hardcopy form, as well as verbally through statements made by their employees and authorized retailers.

118. **Why**: Defendants made their "organic," "all natural" and "vegetable garden" marketing for the express purpose of inducing Plaintiff and the Class to rely on it in their purchase the Product, the effect of which was that Defendants profited by selling the Product to many thousands of consumers.

119. **Injury**: Plaintiff and the Class purchased, paid a premium, or otherwise paid more for the Product when they otherwise would not have absent Defendants' "organic," "all natural" and "vegetable garden" marketing.

## CLASS ALLEGATIONS

120. ***Class Definition*****:** Plaintiff brings this action on behalf all people in the following classes and subclasses (collectively referred to as "Class Members"):

Nationwide Class: during the fullest period allowed by law, all people in the United States who purchased the Product for personal or household use.

California Subclass: during the fullest period allowed by law, all people in California who purchased the Product for personal or household use.

121. Subject to additional information obtained through further investigation and discovery, the foregoing class definitions may be expanded or narrowed by amendment or in the motion for class certification, including through the use of multi-state subclasses to account for material differences in state law, if any.

122. Specifically excluded from the putative classes are Defendants and any entities in which Defendants have a controlling interest, Defendants' agents and employees, the judge to whom this action is assigned, members of the judge's staff and the judge's immediate family.

123. ***Numerosity***. Class Members are so numerous that their individual joinder herein is impracticable. On information and belief, each Class or Subclass includes thousands of consumers. The precise number of Class Members and their identities are unknown to the Plaintiff at this time but may be determined through discovery. Class Members may be notified of the pendency of this action by mail and/or publication through the distribution records of Defendants, their agents, or other means.

124. ***Commonality and Predominance***. Common questions of law and fact exist as to all Class Members and predominate over questions affecting only individual Class Members. Common legal and factual questions include, but are not limited to:

a. Whether Defendants misrepresented and/or failed to disclose material facts concerning the Product;

b. Whether the omissions and representations on the Product's label and the Product's marketing materials, or any single omission or representation, is false, misleading,

and/or deceptive;

c. Whether Defendants' conduct in advertising and selling the Product amounted to unlawful, unfair, and/or deceptive business practices;

d. Whether Plaintiff and the Class Members are entitled to equitable and/or injunctive relief;

e. Whether Plaintiff and the Class Members have sustained damage as a result of Defendants' unlawful conduct;

f. The proper measure of damages sustained by Plaintiff and the Class Members; and

g. Whether Defendants were unjustly enriched by their unlawful practices.

125. ***Typicality***. The claims of the Plaintiff are typical of the claims of the Class Members in that Plaintiff and the Class Members sustained damages as a result of Defendants' uniform wrongful conduct, as alleged above.

126. ***Adequacy***. Plaintiff will fairly and adequately protect the interests of Class Members. Plaintiff has retained counsel that is highly experienced in complex consumer class action litigation, and Plaintiff intends to vigorously prosecute this action on behalf of the Classes. Plaintiff has no interests that are antagonistic to those of the Class Members. Plaintiff has no past or present financial, employment, familial, or other relationship with any of the attorneys in this case that would create a conflict of interest with the proposed Class Members.

127. ***Superiority***. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy for, *inter alia*, the following reasons: prosecutions of individual actions are economically impractical for Class Members; the Class Members are readily definable; prosecution as a class action avoids repetitious litigation and duplicative litigation costs, conserves judicial resources, and ensures uniformity of decisions; and prosecution as a class action permits claims to be handled in an orderly and expeditious manner.

128. Defendants have acted or failed to act on grounds generally applicable to the Class Members, thereby making appropriate final injunctive relief with respect to the Class Members as a whole.

129. Without a class action, Defendants will continue a course of action that will result in further damages to the Plaintiff and Class Members and will likely retain the benefits of their wrongdoing.

**COUNT I**
**Violation of California's Consumers Legal Remedies Act**
**Cal. Bus. & Prof. Code §§ 1750, *et seq.***
**(On Behalf of the California Subclass)**

130. Plaintiff incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

131. Plaintiff brings this claim individually and on behalf of the members of the proposed California Subclass against Defendants.

132. Plaintiff and the California Subclass are "consumers," as the term is defined by California Civil Code § 1761(d).

133. Plaintiff, Class Members, and Defendants have engaged in "transactions" as that term is defined by California Civil Code § 1761(e).

134. The conduct alleged in this Complaint constitutes unfair methods of competition and unfair and deceptive acts and practices for the purpose of the CLRA, and the conduct was undertaken by Defendants in transactions intended to result in, and which did result in, the sale of goods to consumers.

135. As alleged more fully above, Defendants have violated the CLRA by falsely representing to Plaintiff and the other Class Members that the Product is "organic," "all natural" and safe and suitable for "vegetable garden[s]" when in fact the Product is not because it contains PFAS.

136. As a result of engaging in such conduct, Defendants have violated California Civil Code § 1770(a)(5), (a)(7), and (a)(9).

137. Defendants' "organic," "all natural" and "vegetable garden" marketing was likely to deceive, and did deceive, Plaintiff and reasonable consumers. Defendants knew, or should have known, through the exercise of reasonable care, that these statements were inaccurate and misleading.

138. Defendants' misrepresentations were intended to induce reliance, and Plaintiff saw, read, and reasonably relied on them when purchasing Product. Defendants' misrepresentations were a substantial factor in Plaintiff's purchase decision.

139. In addition, class-wide reliance can be inferred because Defendants' misrepresentations were material, i.e., a reasonable consumer would consider them important in deciding whether to buy the Product.

140. Defendants' misrepresentations were a substantial factor and proximate cause in causing damages and losses to Plaintiff and the California Subclass.

141. Plaintiff and the California Subclass were injured as a direct and proximate result of Defendants' conduct because (1) they would not have purchased the Product if they had known that the Product was not "organic," "all natural" nor safe and suitable for "vegetable garden[s];" and (2) they overpaid for the Product because the Product is sold at a price premium due to Defendants' misrepresentations.

142. Accordingly, Plaintiff, on behalf of herself and all other members of the California Subclass, seeks all relief available under this cause of action.

143. On May 13, 2026, a CLRA demand letter was sent to Defendants via certified mail with return receipt requested. This letter provided notice of Defendants' violation of the CLRA, for Plaintiff and the Class, and demanded that Defendants correct the unlawful, unfair, false and/or deceptive practices alleged herein.

## COUNT II
## Violation of California's False Advertising Law
## Cal. Bus. & Prof. Code §§ 17500, *et seq.*
## (On Behalf of the California Subclass)

144. Plaintiff incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

145. Plaintiff brings this claim individually and on behalf of the members of the proposed California Subclass against Defendants.

146. Defendants' acts and practices, as described above, have deceived and are likely to

continue to deceive Class Members and the public. As described throughout this Complaint, Defendants misrepresented the Product as “organic,” “all natural” and safe and suitable for “vegetable garden[s].” By their actions, Defendants disseminated uniform advertising regarding the Product to and across California and the United States. The advertising was, by its very nature, unfair, deceptive, untrue, and misleading within the meaning of Cal. Bus. & Prof. Code §§ 17500, *et seq.* Such advertisements were intended to – and likely did – deceive the consuming public.

147. The above-described false, misleading, and deceptive advertising Defendants disseminated in their “organic,” “all natural” and “vegetable garden” marketing continues to have a likelihood to deceive in that Defendants represented that the Product was “organic,” “all natural” and safe and suitable for “vegetable garden[s]” when in fact the Product is not because it contains PFAS.

148. In making and disseminating these statements, Defendants knew, or reasonably should have known, that their advertisements were untrue and misleading in violation of California law. Plaintiff and the California Subclass based their purchasing decision on Defendants’ “organic,” “all natural” and “vegetable garden” marketing. Plaintiff and the California Subclass were injured in fact and lost money as a result.

149. The misrepresentations by Defendants about the material facts described and detailed herein constitute false and misleading advertising and, therefore, constitute a violation of Cal. Bus. & Prof. Code §§ 17500, *et seq.*

150. As a result of Defendants’ wrongful conduct, Plaintiff and the Class Members lost money in an amount to be proven at trial. Plaintiff and the Class Members are therefore entitled to restitution as appropriate for this cause of action.

151. Plaintiff seeks all available relief under the FAL.

**COUNT III**
**Violation of California’s Unfair Competition Act**
**Cal. Bus. & Prof. Code §§ 17200, *et seq.***
**(On Behalf of the California Subclass)**

152. Plaintiff incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

153. Plaintiff brings this claim individually and on behalf of the members of the proposed California Subclass against Defendants.

154. Cal. Bus. & Prof. Code § 17200 prohibits "any unlawful, unfair, or fraudulent business act or practice." For the reasons discussed above, Defendants have engaged unlawful, unfair, and fraudulent business acts or practices in violation of Cal. Bus. & Prof. Code § 17200.

155. Defendants have violated the UCL by engaging in unlawful business practices by violating the CLRA, Cal. Civ. Code §§ 1770 (a)(5), (a)(7), and (a)(9), by violating California's False Advertising Law, Cal. Bus. & Prof. Code §§ 17500, *et seq.*, by violating Cal. Bus. & Prof. Code § 17580.5, and by violating the common law by, inter alia, making false representations and warranties in their "organic," "all natural" and "vegetable garden" marketing concerning the Product and retaining the unlawfully obtained benefit therefrom. Plaintiff reserves the right to allege additional violations of law which constitute other unlawful business acts or practices.

156. Defendants have also violated the UCL's prohibition on unfair business practices because their conduct is substantially injurious to consumers, offends public policy, and is immoral, unethical, oppressive, and unscrupulous as the gravity of the conduct outweighs any alleged benefits attributable to such conduct.

157. There were reasonably available alternatives to further Defendants' legitimate business interest other than by engaging in the conduct described above.

158. Defendants have further violated the UCL's prohibition on fraudulent business practices by making knowingly, or that which Defendants reasonably should know, false and misleading representations and warranties about their Product which were likely to deceive the consuming public within the meaning of Cal. Bus. & Prof. Code § 17200.

159. Plaintiff and the California Subclass suffered a substantial injury by virtue of buying Product they would not have purchased absent Defendants' unlawful, unfair, and fraudulent marketing and advertising about the capability of their Product.

160. There is no benefit to consumers or competition from Defendants' marketing detailed herein claiming that the Product was "organic," "all natural" and safe and suitable for "vegetable

garden[s]" when it was not.

161. Plaintiff and the California Subclass had no way of reasonably knowing that the Product they purchased was not marketed, packaged, or labeled accurately. Thus, they could not have reasonably avoided the injury each of them suffered.

162. The gravity of the consequences of Defendants' conduct as described outweighs any justification, motive, or reason therefore, particularly considering the available legal alternatives which exist in the marketplace. Such conduct is immoral, unethical, unscrupulous, offends established public policy, or is substantially injurious to Plaintiff and the California Subclass.

163. Plaintiff seeks all available relief under the UCL.

**COUNT IV**
**Unjust Enrichment**
**(On Behalf of the California Subclass)**

164. Plaintiff incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

165. Plaintiff brings this claim individually and on behalf of the members of the proposed California Subclass against Defendants.

166. To the extent required by law, Plaintiff alternatively styles this cause of action as a quasi-contract claim seeking restitution.

167. Plaintiff and the California Subclass conferred benefits on Defendants by purchasing the Product.

168. Defendants have been unjustly enriched in retaining the revenues derived from the California Subclasses' purchases of the Product. Retention of those monies under these circumstances is unjust and inequitable because Defendants warranted that the Product was "organic," "all natural" and safe and suitable for "vegetable garden[s]" when in fact, they are not because it contains PFAS Defendants' misrepresentations caused injuries to Plaintiff and the California Subclass because they would not have purchased the Product if the true facts were known.

169. Because Defendants' retention of the non-gratuitous benefits conferred on it by Plaintiff and the California Subclass is unjust and inequitable, Defendants must pay restitution to

Plaintiff and the California Subclass for their unjust enrichment, as ordered by the Court.

170. Plaintiff and the California Subclass have suffered an injury in fact and have lost money as a result of Defendants' unjust conduct. They lack an adequate remedy at law with respect to this claim and are entitled to non-restitutionary disgorgement of the financial profits that Defendants obtained as a result of their unjust conduct.

## COUNT V
## Fraud
## (On Behalf of the Nationwide Class and California Subclass)

171. Plaintiff incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

172. Plaintiff brings this claim individually and on behalf of the members of the proposed Nationwide Class and California Subclass against Defendants.

173. As discussed above, Defendants provided Plaintiff and Class and Subclass members with false or misleading material information about the Product in their marketing, including but not limited to the fact that the Product was "organic" and "all natural" and safe and suitable for "vegetable garden[s]."

174. These misrepresentations were made with knowledge of their falsehood.

175. The misrepresentations made by Defendants in their "organic," "all natural" and "vegetable garden" marketing, upon which Plaintiff and Class and Subclass members reasonably and justifiably relied, were intended to induce, and actually induced Plaintiff and Class and Subclass members to purchase the Product.

176. The fraudulent actions of Defendants caused damage to Plaintiff and Class and Subclass members, who are entitled to damages and other legal and equitable relief as a result.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendants, as follows:

a. For an order certifying the Classes and naming Plaintiff as the representative of the Classes;

b. For an order declaring Defendants' conduct violates the statutes referenced herein;

c. For an order finding in favor of Plaintiff and the Classes on all counts asserted herein;

d. For actual, compensatory, statutory, and/or punitive damages in amounts to be determined by the Court and/or jury;

e. For prejudgment interest on all amounts awarded;

f. For an order of restitution and all other forms of equitable monetary relief;

g. For injunctive relief as pleaded or as the Court may deem proper; and

h. For an order awarding Plaintiff and the Classes their reasonable attorney fees, expenses, and costs of suit.

**JURY TRIAL DEMANDED**

Plaintiff demands a trial by jury on all claims so triable.

Dated: August 14, 2026

Respectfully submitted,

*/s/ Rachel Soffin*

**PEARSON WARSHAW, LLP**
Rachel Soffin* (MI Bar No. P89509)
Kelsey Gatlin Davies*
Mailing Address:
15165 Ventura Boulevard, Suite 400
Sherman Oaks, California 91403
Telephone: (818) 788-8300
Facsimile: (818) 788-8104
Email: rsoffin@pwfirm.com
kdavies@pwfirm.com

**SMITH KRIVOSHEY, PC**
Yeremey O. Krivoshey (CA Bar No. 295032)
Brittany S. Scott (CA Bar No. 327132)
28 Geary Str Suite 640 # 1507
San Francisco, CA 94108
Telephone: 415-839-7077
Facsimile: 888-410-0415
E-Mail: yeremey@skclassactions.com
brittany@skclassactions.com

**SMITH KRIVOSHEY, PC**
Joel D. Smith (CA Bar No. 244902)
867 Boylston Street 5th Floor #1520
Boston, MA 02116
Telephone: 617-377-4704

Facsimile: (888) 410-0415
E-Mail: joel@skclassactions.com

*Attorneys for Plaintiff*

*Admitted *Pro Hac Vice*